519-0522-WC, The American Coal Company Appellant v. The Workers' Compensation Commission, Michael W. Frerichs, State Treasurer and Ex Officio Custodian of the Rate Adjustment Fund, and Robert Deere, Appellees. Okay, Ms. Webb, you may proceed. Thank you, Your Honor. May it please the Court, Mr. Wessore. My name is Julie Webb and I represent the Appellant, The American Coal Company, in this case. The issue we have here is one of determination of disease in an occupational lung disease case. This is a manifest weight standard and I understand the difficulty in meeting that standard. In order for a finding to be against the manifest weight of the evidence, of course, an opposite conclusion must be clearly apparent, and we believe in this case that that is just the case, that there is clearly opposite conclusion that should be rendered here than what the Commission found. In this case, the Workers' Compensation Commission made an award based on a finding of COPD, chronic obstructive pulmonary disease, and chronic bronchitis. First, I would like to address the issue of the finding of COPD. In this case, both experts, both Dr. Pohl for the employee, Dr. Castle for the employer, are in agreement that the FEV1-FVC ratio if it's 75% or greater, then that is normal and there's no obstruction, no obstructive disease present. So, we're going to take a look at what does the evidence show as to what would be the correct ratio for Mr. Deere. We only have one pulmonary function test that is at issue, the one that was taken as part of Dr. Pohl's testing and examination in November of 2015. Dr. Pohl, in his report that he prepared following that testing and examination, noted that the pulmonary function testing was within normal limits, but then at his deposition, testified that the results were abnormal because the FEV1-FVC ratio was 74%. So, we're going to look at how do we calculate this FEV1-FVC ratio. Dr. Pohl did not provide an explanation as to how he arrived at that 74% figure. We can conclude, going back and looking at it, that he used the results from two different trials to arrive at that 74%. But again, he did not actually provide the explanation during his deposition. So, let me interject a question if I can. I understand what you're saying and yet would you agree that the commission found ultimately the testimony of Dr. Pohl to be superior to the I think that their finding was incorrect because they based it on his testimony that 74% was the correct calculation. And I think as Dr. Castle testified and as the other authorities show, that if you use the correct figures from the pulmonary function testing, that that is not the correct response. Did I understand you to say earlier that Dr. Pohl did two tests? No, he just did one pulmonary function test. There were three different trials within that test. Okay. And in determining whether there is an obstruction present, as Dr. Castle testified, one takes the greatest FEV1 from whichever one of those trials and divides that by the greatest forced vital capacity, whichever trial it is. They do not have to be from the same trial. It can be from the testing as trial one, two, or three. That Dr. Pohl may have used an average of the three tests, pulmonary tests, to make the calculation? Well, we don't know how Dr. Pohl arrived at that because he did not provide any explanation as to how he arrived at the 74%. If you take the next highest FEV1 and divide it by the highest FVC, you end up with 74%. That's a speculation on my part, is that Dr. Pohl simply used the wrong number. When he's looking at these three trials, he did not take the greatest number as the number that he should have used in calculating the ratio. Now, is this the definitive, is it just the metric that defines whether it exists or doesn't exist? Yes, I mean, both doctors testified that if the ratio is above 75%, then the testing is normal and there's no finding of obstruction in this gentleman. There's no other evidence in the record that he suffers from COPD other than Dr. Pohl's finding. In addition to Dr. Castle testifying as to the proper ratio, the AMA guides and the American Thoracic Society guidelines provide that that's the method for calculating the proper FEV1 FVC ratio, that you take the maximal efforts, or not the efforts, sorry, but the maximal results in making that calculation. I note that after we filed our reply brief, we failed to include the pinpoint sites of the guidelines that we had included in our brief. And I would point out to you now that those guidelines are found at A30 and A53 in the appendix to the reply brief. And those guidelines, again, provide that when interpreting spirometry, the largest FVC and largest FEV1, even if they're not from the same trial, are to be used in calculating the test. We have the one result, again, Dr. Pohl's testing, where if the highest or greatest FEV1 is used, that is divided by the greatest FVC, we arrive at a ratio of 75%, which both doctors here agree is a normal test and does not lead to a finding of obstruction. Okay, so let me kind of parse out some of this science and medical science, I guess you'd call it, or metric. A patient or a claimant has three trials, isn't that correct, to measure pulmonary functioning? Correct. Generally, there's three bronchodilator a lot of times given, and there's three trials post-bronchodilator, but here we're strictly talking the three trials pre-bronchodilator. So the guidelines of these associations say you look at the highest number out of those three, am I correct? That is correct. Okay, what does the highest number represent, maximal exertion? It's the, well, on the forced vital capacity, I mean, going back up to forced expiratory volume, that's how much they can exhale in one second. The forced vital capacity is the capacity of the lung, what they're able to, and so that shows what they're able to exhale, and again, the guidance provides that 75%, if the ratio is 75%, it does not represent an obstruction. But why do we do two other trials then? If we don't consider any of the metrics from the other two trials, why do we just do that? I'm just curious. The guidelines that provide that you take the maximum also provide that at least three trials should be performed, because the three trials, to make sure you're getting the best results, because you have to look at whether they're reproducible, they've got to be within a certain range of one another, you can test them more than three trials to make sure you're getting the best effort. But if we're talking about a condition that's chronic, it means it exists presently at all times, presumably, correct? I mean, what's chronic? It's a repetitive... Yeah, they're all the time. If we're talking about chronic pulmonary disease or obstructive, you know, COPD, okay, it would appear to me that the presence would be an average of all those different trials. I mean, none of us sitting right now, all of us, are pretty much at quasi rest, okay? But if the disease, I don't know, I'm just curious about that, but that has nothing to do with your argument, if that's what the guidelines say, but they are guidelines, right? Well, I mean, that's what the American Thoracic Society puts forth as their guidelines directing pulmonologists and other physicians on how these tests should be conducted and interpreted. And I understand, Justice, your point on, well, they may be taking the average, but I guess that's not what the science tells us to do. And I'm a pulmonologist, I mean, I can't argue with that science. I suggest they're taking the best case scenario, right? Right, that they're showing that the best that the patient can do. And again, it doesn't have, the results don't have to be from the same trial. In this case, his best efforts were not in the same trial or the best numbers. So you take the one, the best one out of the three for FVC, the best of the three out of FEV1. So that's part of the reason, I mean, you've got to do multiple trials because it's not even necessarily coming out of the same curve. And that's what the guidelines provide. We're not arguing here anything that's different or out of the ordinary. We're just pointing out what the guidelines provide. And when these, the Mr. Feers testing is interpreted according to the guidelines, he does not meet a finding of obstruction. Ms. Webb, can I ask a question? Yes. In arriving at a diagnosis of COPD or chronic bronchitis, can't an expert reasonably base his recommendations or his findings based on his own medical experience or the expert's own medical experience totally irrelevant here? Well, I think we're talking about COPD. I think it's based on the scientific, the objective testing. And that's what Dr. Paul based it on was his finding of the 74%. I don't think Dr. Paul was necessarily, you know, finding that in this gentleman, he had COPD based on his, I mean, his examination because you're only going to find chronic obstructive pulmonary disease if you have some testing, objective testing to show that's the disease that's present. It's not something you can just look at a gentleman, listen to his chest, or maybe you can see it on chest x-ray, although there's no evidence here that there was such a finding on his chest x-ray. But generally it's based on a pulmonary function testing. You feel that Dr. Kessel's opinion was superior to that of Dr. Paul, correct? I don't know. I would not know if I say his opinion is superior. He shared what the guidelines are. He followed the guidelines in making his determination as to what this gentleman's ratio would be. Am I correct in reading this? The arbitrator found Kessel persuasive and found Paul not persuasive as to both CWP and COPD. Correct. Commission gets the case and cuts the on CWP, but finds Paul more persuasive on COPD. Well, I think with regard to CWP, there was also Dr. Meyer included in interpreting the chest x-ray. Yeah. Well, Smith decided he had CWP, but he's no bee reader. But at any rate, the commission actually cut the baby in half, found each one of them more persuasive as to a different disease. Correct. I think that's what they did. The problem is they didn't have the evidence to back up their finding that Dr. Paul was more persuasive because his calculation in rendering that opinion was not based on the science that tells us the guidelines that tell us how to make that calculation. Ms. Webb, did Dr. Kessel ever meet with or examine the claimant or take a from him? No, he did not. Is that relevant at all? Not with regard to the COPD. The COPD, as I said, is based on this objective testing. Dr. Kessel reviewed just as Dr. Paul reviewed, agreed that the testing was valid and it's reasonable for him to make an interpretation based on that valid testing even without having the opportunity to meet the patient. Ms. Webb, your red light has gone on. You'll have time in reply. Okay. I was just getting ready to say thank you. My time was up. Okay. Thank you. Mr. Rezor, you may respond. May it please the court. Ms. Webb, my name is Bruce Rezor and I represent Robert Deere. There were three diseases alleged, CWP, chronic bronchitis, and COPD. The commission found there was no CWP, but there was chronic bronchitis and COPD. All three decisions had a basis in the evidence. Claimant disagrees with the decision on CWP, but the commission shows American's cold witnesses and that decision wasn't against the manifest way to the evidence. Claimant doesn't contest the decision on CWP. The commission's findings of chronic bronchitis and COPD were also not against the manifest way to the evidence and the commission's decision should be affirmed. There were two witnesses and the commission found Dr. Paul to be the most persuasive. That choice was not against the manifest way to the evidence. The commission accepted the fact that chronic bronchitis is one of the chronic obstructive pulmonary diseases. Therefore, if you have chronic bronchitis, you have COPD. It was undisputed in the evidence that the diagnosis of chronic bronchitis is based on a patient history of cough and its frequency. The commission had the testimony of Dr. Paul, Dr. Castle, and the treatment records. It weighed that evidence and found that the treatment records were sufficient to support Dr. Paul. As to the issue of nature and extent, the commission reviewed the five factors and awarded 10%. There's plenty of room in any one of those five factors to support a 10% award. An award of 10% is more than fair to the employer in this case. That takes care of the manifest way question on those issues. I thought it was interesting that the commission began its conclusions, the first sentence of its conclusion saying the commission adopts the arbitrator's statement of facts in its entirety. However, the commission views the evidence different from the arbitrator. I think that pretty much says what this case is about. Now, there's one other argument by the employer that I do want to address. The employer cited the Dawson case to argue the claimant had not proven disablement under the act. Now, it refined that argument here to claim that it only refers to the second prong of the definition of disablement under the act. Well, that argument's improper for three reasons. First, once disablement's been shown, proven by showing an impairment in a function of the part of the body, it isn't necessary to prove the second half of the definition of disablement. Here, there is no argument by employer that chronic cough is not an impairment in the function of the respiratory system. The two halves of the definition are joined by the conjunction or. Either one will get the job done. Second, all that a claimant needs to prove under the second half of the definition is that he can't return to the environment of a coal mine without endangering his life or health. Now, the five factors that were listed in the Dawson case and in the briefs of the employer aren't necessary to prove what this guy must prove under the second prong. The five factors of the Dawson case address the question of why the man left mining, not whether he couldn't safely return. Third, and most important, the Dawson case was not an 8D2 case, as was before the commission here. It was a wage differential claim, and the argument in that case was a manifest weight argument. The affirmation by the court didn't make the considerations of the commission in Dawson matters of law to apply to all wage differential cases, and surely not to all 8D2 cases. That affirmation was that, given the facts of that particular case, the decision of the commission was not against the manifest weight of the evidence. I won't take time to repeat those five factors considered by the commission in Mr. Dawson's wage differential claim, but none of them are a bar to the relevant questions here, which are, number one, does claimant have chronic bronchitis and COPD? Two, were those diseases caused in part or aggravated in part by his coal exposure? And three, do those diseases, as seen in this claimant, meet the definition of disablement under the act? When those questions are answered in the affirmative, the last question is, what's the nature and extent? And in this case, a wage differential is not one of those possible outcomes. Claimant waived that possibility. The Dawson case is cited in case after case of 8D2 cases by the employer to prove there is no disablement under the act. That was its argument before the commission in this case. The Dawson case is not relevant in an 8D2 claim, whether the issue is the first or the second half of the definition of disablement, and claimant asks that the court refuse the employer's request to reweigh the evidence and affirm the decision. Thank you. Any further questions? I have a question. Mr. Wessor, Ms. Webb seems to be suggesting that the pulmonary function tests control the outcome of this case. What's your reaction to that? Well, they don't, in that I see the case going from chronic bronchitis to COPD, not the other way around, because chronic bronchitis is a COPD. That's in the evidence here. If you have proven chronic bronchitis, which Dr. Paul did and the commission accepted, then you have COPD, whether you actually prove an obstruction in the testing or not. Now, I think that the arguments over whether it's 74% or 75% are kind of a waste of the court's time. They're so close, what difference would it make, which one you pick. But the most important thing is the commission, in looking at this, decided that Dr. Paul's explanation was the best. Given all of his testimony, they believe Dr. Paul to be more credible and persuasive, and they accepted his, and that should rule the outcome here. Okay. Very good. Thank you, Mr. Wessor. Ms. Webb? Yes, Your Honor. Thank you. With regard to the chronic bronchitis, I don't think it's as clear as Mr. Wessor would indicate. Dr. Paul did diagnose chronic bronchitis. Now, the definition of chronic bronchitis is chronic cough, productive of sputum, and there's the key word, productive of sputum, that occurs on most days for at least three consecutive months per year for at least two years in succession. The history provided to Dr. Paul does not meet that of chronic cough being present. However, he did not provide any evidence or any history of that cough being productive. If you look back through the medical records that are in evidence, there are a number of entries where cough was included in the history of complaints. There's never a diagnosis of chronic bronchitis in those medical records. Those entries of cough, there are a couple times the cough's noted to be productive. Sometimes it's specifically noted to be non-productive, and then there are several entries where there's no indication one way or the other whether it was productive. So, there's nothing in the evidence that supports a finding of chronic bronchitis when chronic bronchitis requires that sputum production be present with a chronic cough over the specific period of time. Wasn't there anything in the records though that seemed to say that on an annualized basis he was X number of months afflicted with bronchitis? He told Dr. Paul that he had a cough that was present two or three times a year for a couple months at a time. And yes, as far as the length of the time of the cough, that would meet that part of the definition. He still did not provide history that this cough was productive, which is required as part of the definition of chronic bronchitis, again according to the American Thoracic Society. And we've cited in our brief the citation to that in the chronic bronchitis. And in this case, there's just not any evidence of that sputum production on a regular basis to meet the definition. So, the finding of chronic bronchitis as well as COPD would be against the manifest way to the evidence here. Mr. Ossor mentioned that he kind of goes the other way here. Chronic bronchitis is COPD. If you've got chronic bronchitis, you have COPD. COPD stands for chronic obstructive pulmonary disease. If this gentleman did not have an obstruction, he could not have chronic obstructive pulmonary disease. So, that 74% versus 75% is very critical. It's not just a matter of 1% where we're talking if he's in the normal range versus abnormal range. That 1% determines whether he has an obstruction, whether he doesn't have an obstruction. And in this case, if the correct numbers are used, then he does not have an obstruction. I want to briefly address the issue of nature and extent and the five factors that the commission should consider in determining the nature of the condition. Dr. Hassel stated that no physician gave an impairment rating pursuant to the AMA guides. That is just absolutely incorrect. No physician provided a written report on the AMA guides, but Dr. Hassel clearly testified that under the AMA guides, he would fall in class zero impairment based on his testing results. The commission ignored that. Now, if the commission wants to reject that report and they can provide some basis for not ruling inconsistently with that impairment rating, that's one thing. But here, the commission completely ignored it. So, at the very least... Requirement is the form of a report that is required. I'm sorry, Your Honor, I did not hear the beginning of your question. Is the form of a report. What we have is a statement by the doctor which you said what the statement was in a deposition. Am I correct? That is correct. It was not in his written report. I don't think it's required to be in the written report. I think it's still an opinion based on the impairment rating, which the commission chose to completely ignore. So, even if this is affirmed, I think this should be remanded for the commission to at least consider in nature and extent to consider the impairment rating by Dr. Castle. Thank you very much. Well, thank you both, counsel, for your arguments on this matter.